IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LEVERT SMITH and NELSON D. RADFORD,
Co-Administrators of the Estate of
JOSEPH JEREMAINE PORTER,

       Plaintiffs,

v.                              Civil Action No. 5:12CV86
                                             (STAMP)

SCOTTSDALE INSURANCE COMPANY,
SCOTTSDALE INDEMNITY COMPANY
and NATIONWIDE INSURANCE COMPANY,

       Defendants.


**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANT SCOTTSDALE INSURANCE COMPANY'S**
**MOTION FOR SUMMARY JUDGMENT,**
**GRANTING THE PLAINTIFFS' MOTION TO SEAL AND**
**DENYING THE PENDING MOTIONS IN LIMINE AS MOOT**

I.  Procedural History

The plaintiffs originally filed this civil action in the Circuit Court of Ohio County, West Virginia. Thereafter, the defendants removed the action to this Court based on diversity jurisdiction. The plaintiffs are the Co-Administrators of the Estate of Joseph Jeremaine Porter. Mr. Porter was killed in a shooting involving Police Officer Ronald Lusk ("Officer Lusk"), who was employed by the City of Huntington's ("the City") Police Department. The remaining defendant in this civil action,

Scottsdale Insurance Company ("Scottsdale"),[1] was the City's insurer at that time of the shooting.

In an underlying civil action that began before this current action against Scottsdale ("underlying action"), the plaintiffs sued the City and Officer Lusk.[2] Scottsdale provided the defense for the City and Officer Lusk in that underlying action. Mediation and settlement negotiations between the parties ended without success. While the underlying action proceeded, the defendants in this civil action filed a motion to stay proceedings until the resolution of the underlying action. ECF No. 35. This Court granted that motion. ECF No. 49. Eventually, all claims in the underlying action were resolved in favor of the City and Officer Lusk, either through summary judgment, judgment as a matter of law, or through a jury verdict. Further, the United States Court of Appeals for the Fourth Circuit affirmed the jury verdict in favor of the defendants in the underlying action. ECF No. 173 Ex. O.

Following the resolution of the underlying action, this Court ordered that the stay of this civil action be lifted. ECF No. 50. The civil action addressed in this memorandum opinion arises from the unsuccessful mediation and settlement negotiations between

---

[1]This Court previously dismissed defendants Scottsdale Indemnity Company and Nationwide Insurance Company pursuant to the parties' stipulation of dismissal. ECF No. 24.

[2]Plaintiffs' claims in the underlying action were for negligence, wrongful death, and for a deprivation of constitutional rights under 42 U.S.C. § 1983.

Scottsdale and the plaintiffs.  The plaintiffs assert two counts in their complaint.  Count I of the complaint asserts that Scottsdale violated the West Virginia Human Rights Act ("WVHRA") when it did not settle the plaintiffs' claims against the City and Officer Lusk.  Count II of the complaint, filed pursuant to the West Virginia Uniform Declaratory Judgments Act, requested that this Court determine the rights of the parties as to a consent clause in the insurance policy between the City and Scottsdale. Specifically, the plaintiffs requested that this Court find that Scottsdale may not rely on the consent clause to defend against its actions, when it knew or should have known that the City's refusal to give consent to settle was motivated by racial considerations. Only Count I remains, however, because Count II of the complaint was dismissed pursuant to this Court's memorandum opinion and order granting Scottsdale's partial motion to dismiss.  <u>See</u> ECF No. 67.

At issue in this memorandum opinion are the parties' most recent filings.  Specifically, the parties filed the following: (1) Scottsdale filed a motion for summary judgment (ECF No. 173); (2) the plaintiffs filed a second motion to seal (ECF No. 192); and (3) the parties both filed several motions in limine.  For the reasons set forth below, Scottsdale's motion for summary judgment is granted, the plaintiffs' motion to seal is granted, and the parties' remaining motions in limine are denied as moot.

## II.  <u>Facts</u>

On November 8, 2009, police officers for the City responded to reports of gunshots at a night club in Huntington, West Virginia. Officer Lusk, one of the responding officers and later a defendant in the underlying action, shot and killed Joseph Jeremaine Porter. The grand jury did not indict Officer Lusk, finding Officer Lusk acted out of self-defense.  ECF No. 173 Ex. D.  The former administrators of the decedent's estate in the underlying action filed a wrongful death suit against the City and Officer Lusk. They alleged civil rights violations against Officer Lusk, in his individual capacity, and the City under 42 U.S.C. § 1983.  They also alleged claims of negligence against those defendants.

Prior to the shooting, Scottsdale issued a public entity insurance policy to the City.  ECF No. 173 Ex. A.  The insurance policy provided coverage for "law enforcement wrongful acts" that occurred during the course and scope of "law enforcement activities."  <u>Id.</u>  However, regarding Scottsdale's authority to settle, the insurance policy contained a consent to settle clause that prohibited Scottsdale from unilaterally agreeing to settle any claims.  Instead, the provision required the consent of the insured in order to agree to settle any claims.  Specifically, the clause states the following:

> We [Scottsdale] have the right to investigate any "claim" or "suit" but we will not settle or compromise a "claim" or "suit" without your written consent.  If consent is refused and you elect to contest the "claim" or "suit" or

4

> continue legal proceedings, then our [Scottsdale]
> liability for the "claim" or "suit" will not exceed the
> amount for which the "claim" or "suit" could have been
> settled, plus "loss adjustment expense" incurred up to
> the date of your refusal.

Id. at Ex. A.  Accordingly, Scottsdale could not unilaterally settle a claim unless the insured, here the City, consented in writing.

The parties attempted to mediate the underlying case, which failed.  Later, in the underlying action, the City and Officer Lusk filed motions for summary judgment.  Judge Robert C. Chambers in the United States District Court for the Southern District of West Virginia granted summary judgment in favor of the City regarding the plaintiffs' § 1983 claim.  ECF No. 173 Ex. J.  Further, Judge Chambers denied Officer Lusk's motion and held the remaining state law claims in abeyance.  Id.  At trial, the jury found in favor of Officer Lusk, and Judge Chambers then dismissed the remaining claims against the City.  ECF No. 173 Ex. K.  The plaintiffs in the underlying action appealed the jury verdict, which the United States Court of Appeals for the Fourth Circuit affirmed.  ECF No. 173 Ex. O.

The above-listed plaintiffs, who substituted the co-administrators in the underlying action, then filed this current civil action against Scottsdale.  As provided earlier, the plaintiffs asserted two counts in their complaint.  Count I of the complaint asserted that Scottsdale violated the WVHRA when it did

not settle the plaintiffs' claims against the City and Officer Lusk. Specifically, the plaintiffs claim that racial animus existed between the City's Police Department and African-Americans. The plaintiffs point to a series of alleged incidents where police officers used derogatory language regarding African-Americans as well as instances that they claim demonstrate a bias against African-Americans. They argue that such racial animus explains why the City refused to consent to settle the underlying action. Further, despite this alleged objective evidence of the City's racial animus, the plaintiffs argue that Scottsdale, in violation of an alleged duty, failed to properly consider or analyze such racial animus for settlement purposes. The plaintiffs point to the consent clause, arguing that because Scottsdale adhered to the consent requirement, it aided and abetted the City's unlawful refusal in attempting to resolve or settle the underlying action. In addition, the plaintiffs also claim that the consent to settle clause served as a pretext for the City and Scottsdale's discriminatory actions.

Count II of the complaint, filed pursuant to the West Virginia Uniform Declaratory Judgments Act, requested this Court to determine the rights of the parties as to the consent clause in the insurance policy between the City and Scottsdale. However, only Count I remains because Count II of the complaint was dismissed

under this Court's memorandum opinion and order granting Scottsdale's partial motion to dismiss. <u>See</u> ECF No. 67.

The parties have now filed the following documents that are at issue in this memorandum opinion and order: (1) Scottsdale filed a motion for summary judgment (ECF No. 173); (2) the plaintiffs filed a second motion to seal (ECF No. 192); and (3) the parties both filed several motions in limine. The motion for summary judgment and motion to seal are discussed below. Regarding the motions in limine, those are discussed later in this memorandum opinion.

A. <u>Scottsdale's Motion for Summary Judgment</u>

Scottsdale presents four arguments as to why this Court should grant its motion. First, Scottsdale claims that the plaintiffs are attempting to relitigate this case. Specifically, they point to the fact that the City prevailed in the underlying action. They assert that Judge Chambers dismissed the plaintiffs' claim against the City, and that a jury rendered a verdict in favor of Officer Lusk. ECF No. 173 Exs. K and L. They also point to the fact that the United States Court of Appeals for the Fourth Circuit affirmed the judgment. ECF No. 173 Ex. O. Scottsdale also claims that the holding in <u>Michael v. Appalachian Heating, LLC</u>, 701 S.E.2d 116 (W. Va. 2010), which plaintiffs claim creates the duty that Scottsdale breached, provides that an allegation of racial discrimination in an insurance claim handling can arise after a settlement has been reached. However, Scottsdale asserts that <u>Michael</u> does not permit

a discrimination lawsuit related to an insurance claim handling where the underlying action resulted in a clear verdict as to liability. Here, Scottsdale distinguishes <u>Michael</u> from the plaintiffs' claim, in that the issue of liability in this civil action remained contested until the underlying action resulted in judgment for the City and Officer Lusk. In contrast, Scottsdale believes that <u>Michael</u> presented a situation where liability was already determined but that the valuation and settlement process remained in dispute. Based on this distinction, Scottsdale argues that <u>Michael</u> prohibits the plaintiffs' cause of action against Scottsdale. Accordingly, because the underlying action failed on its merits against the City and Officer Lusk, Scottsdale believes that the plaintiffs are trying to have a "second bite at the apple" by focusing on Scottsdale rather than the City or Lusk.

Second, Scottsdale claims that the plaintiffs failed to satisfy the elements of a discrimination claim under the WVHRA. Specifically, it argues that (1) the plaintiffs, namely the Estate, are not a protected class; (2) the Estate did not suffer an adverse insurance claim handling decision; (3) no evidence exists showing that Scottsdale's decision would have differed "but for" the race of the deceased; (4) even if a prima facie case exists, Scottsdale has nondiscriminatory reasons for not settling, such as the consent clause; and (5) that no pretext for discrimination exists. Third, Scottsdale argues that the individual beneficiaries to the

plaintiff are not entitled to recover from Scottsdale. Here, Scottsdale relies heavily on AIG Domestic Claims, Inc. v. Hess Oil Co., Inc., 751 S.E.2d 31 (W. Va. 2013). Finally, Scottsdale believes that the plaintiffs are not entitled to punitive damages.

The plaintiffs then filed their response in opposition. ECF No. 185. The plaintiffs appear to first argue that Scottsdale had a duty to investigate the evidence or complaint of discrimination in the settlement process. In support of their argument, the plaintiffs state they are relying on Michael and the law developed under the WVHRA. Further, the plaintiffs look to statistics of minority settlements to show that Scottsdale would be less likely to settle with the plaintiffs, or that at least this hardship should have made Scottsdale more attuned to race being an issue in the settlement process. The plaintiffs then provide instances of alleged racial animus that they argue shows that Scottsdale had a duty to investigate the risk of racial animus or discrimination in the settlement process.

Second, the plaintiffs argue that pretext for discrimination existed. The plaintiffs point to alleged deviations in company policy when settling claims, and that those deviations from industry standards demonstrates a pretext for racial discrimination. The plaintiffs point to Carlile v. Farmers Ins. Exchange, 219 Cal. Rptr. 773, 776 (Cal. App. 1985), which they use to demonstrate a case where an insurer actually conducted the

claims process in good faith, as allegedly contrasted by Scottsdale's conduct. Finally, the plaintiffs claim that the Estate is a person for WVHRA purposes. Further, the plaintiffs also assert that the beneficiaries will benefit from the proceeds of a judgment in their favor, and that this beneficiary interest provides standing for them to proceed.

Scottsdale timely filed a reply. In its reply, Scottsdale first claims that <u>Michael</u> does not impose a duty on Scottsdale. Scottsdale also alleges that the plaintiffs base their duty argument upon the testimony of a questionable expert, Dr. Timothy J. Berard. Second, Scottsdale argues that the WVHRA does not extend standing to the Estate because the Estate is neither a person nor within the "zone of interest" that the WVHRA intends to protect. Third, Scottsdale argues that the WVHRA requires intentional conduct, which the plaintiffs have failed to provide. Finally, Scottsdale asserts that the analysis under <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973), applies because the plaintiffs provide no direct evidence of racial animus or pretext. Accordingly, their claim has no merit.

B. <u>The Plaintiffs' Second Motion to Seal</u>

Following Scottsdale's motion for summary judgment, the plaintiffs then filed a second motion to seal. ECF No. 192. Prior to that second motion to seal, the plaintiffs previously filed a motion to seal, which pertained to sensitive information in their

response to Scottsdale's motion for summary judgment. ECF No. 184.

Out of an abundance of caution, this Court provisionally granted

that motion because the plaintiffs in their prior motion did not

identify what materials needed to be sealed. ECF No. 185. In

their second motion to seal, which is at issue here, they

identified specific materials and again request this Court to seal

them. Scottsdale did not respond.

### III. <u>Applicable Law</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure,

> A party asserting that a fact cannot be or is genuinely
> disputed must support the assertion by:
>     (A) citing to particular parts of materials in the
> record, including depositions, documents, electronically
> stored information, affidavits or declarations,
> stipulations . . . admissions, interrogatory answers, or
> other materials; or
>     (B) showing that the materials cited do not
> establish the absence or presence of a genuine dispute,
> or that an adverse party cannot produce admissible
> evidence to support the fact.

Fed. R. Civ. P. 56(c). The party seeking summary judgment bears

the initial burden of showing the absence of any genuine issues of

material fact. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23

(1986). "The burden then shifts to the nonmoving party to come

forward with facts sufficient to create a triable issue of fact."

<u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir.

1991), <u>cert. denied</u>, 502 U.S. 1095 (1992) (citing <u>Anderson v.

Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)). However, as the

United States Supreme Court noted in <u>Anderson</u>, "Rule 56(e) itself

11

provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250; <u>see also</u> <u>Charbonnages de France v.</u> <u>Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing <u>Stevens</u> <u>v. Howard D. Johnson Co.</u>, 181 F.2d 390, 394 (4th Cir. 1950))).

In <u>Celotex</u>, the Supreme Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

IV.  <u>Discussion</u>

As stated earlier, Scottsdale's motion for summary judgment and the plaintiffs' motion to seal are at issue in this civil action.  Further, the parties filed several motions in limine.  Those motions are discussed below in the order presented.

A.  <u>Scottsdale's Motion for Summary Judgment</u>

In its motion for summary judgment, Scottsdale presents the following four arguments as to why this Court should grant its motion: (1) that the plaintiffs already litigated this claim in the underlying action and that <u>Michael v. Appalachian Heating, LLC</u> is distinguishable from this civil action; (2) that the plaintiffs fail to prove a prima facie case of racial discrimination under the WVHRA; (3) that the individual beneficiaries to the Estate are not entitled to recover pursuant to <u>AIG Domestic Claims, Inc. v. Hess Oil Co., Inc.</u>; and (4) the plaintiffs are not entitled to punitive damages.

The plaintiffs argue that this Court should deny Scottsdale's motion for the following reasons: (1) Scottsdale had a duty to investigate incidents of discrimination during the settlement process and failed to do so; (2) that the consent to settle clause served as a pretext for discrimination under the WVHRA; and (3) that an estate can be considered a person under the WVHRA.

Enacted in 1967, the WVHRA reflects the "public policy of the State of West Virginia in the field of human relations," meaning

that it "is designed to prohibit discrimination in employment, in housing accommodations and places of public accommodations by reason of race, religion, color, national origin, ancestry, sex or age." W. Va. Human Rights Comm'n v. Tenpin Lounge, Inc., 211 S.E.2d 349, 350-51 (W. Va. 1975). This broad policy and purpose has been applied to many contexts, including "the unlawful discrimination by a tortfeasor's insurer in the settlement" of a claim when the insurer bases its discrimination on the prohibited criteria listed above. See Michael v. Appalachian Heating, LLC, 701 S.E.2d 116, 124-25 (W. Va. 2010). Phrased another way, "an insurer settling a property damage claim with a member of a protected class in a discriminatory manner that causes economic loss violates the act." Id. at 124.

The WVHRA's application is further expanded by West Virginia Code § 5-11-9(7)(A), which creates three distinct causes of action. Id. at 123. Under that section, it is an unlawful discriminatory practice for certain entities and groups, including persons, employers, or financial institutions, to do any of the following: "(1) engage in any form of threats or reprisal;" or "(2) engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss;" or "(3) aid, abet, incite, compel or coerce any person to engage in any of the unlawful discriminatory practices" under West Virginia Code

§ 5-11-9. <u>Id.</u> Further, an insurance company is considered a "person" for purposes of § 5-11-9(7). <u>Id.</u>

To prove a prima facie case of unlawful discriminatory practices under the WVHRA, the plaintiff must show that "(1) the plaintiff is a member of a protected class," (2) that the defendant "made an adverse decision concerning the plaintiff," and (3) but for the plaintiff's protected status, the defendant would not have made the adverse decision. Syl. Pt. 3, <u>Conaway v. E. Assoc'd Coal Corp.</u>, 358 S.E.2d 423 (W. Va. 1986); <u>see</u> <u>Smith v. Sears, Roebuck & Co.</u>, 516 S.E.2d 275 (W. Va. 1999); <u>Barefoot v. Sundale Nursing Home</u>, 457 S.E.2d 152, 161 (W. Va. 1995); <u>McCauley v. Merrimac, Inc.</u>, 460 S.E.2d 484 (W. Va. 1995) (per curiam). In proving the third requirement, the plaintiff must show evidence that would "sufficiently link" the plaintiff's protected member status and the defendant's decision to infer that the defendant used discriminatory criteria. <u>Conaway</u>, 358 S.E.2d at 429-430 (footnotes omitted); <u>Smith</u>, 516 S.E.2d at 279. This could include an (1) admission, (2) eliminating an apparently legitimate reason for the decision in showing unequal or disparate treatment between protected class members and others, or (3) "using statistics in a large operation" to show that protected class members received "substantially worse" treatment. <u>Conaway</u>, 358 S.E.2d at 429-30 (footnotes omitted).

If a plaintiff satisfies that burden, then the defendant must offer a legitimate, nondiscriminatory reason for the decision. <u>Barefoot</u>, 457 S.E.2d 152, 160. After the defendant presents its reasons, the plaintiff may then demonstrate that either (1) the defendant treated discriminatory criteria as a determinative factor in its decision, or (2) the defendant's rationale serves as merely a pretext for discrimination. <u>Id.</u> To show pretext, a plaintiff must show direct or circumstantial evidence of falsity or discrimination. <u>Id.</u> "The plaintiff's failure to come forth with evidence rebutting the defendant's explanation may entitle the defendant to judgment." <u>Id.</u>

What can be ascertained under the case law discussed above is that the WVHRA does provide a third-party cause of action against an insurer that engaged in unlawful discrimination during the processing of the tortfeasor's claim. <u>See</u> <u>Michael v. Appalachian Heating, LLC</u>, 701 S.E.2d 116 (W. Va. 2010). However, the burden remains on the plaintiff to first demonstrate that a prima facie case exists before moving forward with the remaining analysis provided above. As will be discussed below, the plaintiffs have not satisfied their burden.

1. <u>Prima Facie Case</u>

As stated earlier, in order to prove a prima facie case exists under the WVHRA, the plaintiff must show that "(1) the plaintiff is a member of a protected class," (2) that the defendant "made an

adverse decision concerning the plaintiff," and (3) but for the plaintiff's protected status, the defendant would not have made the adverse decision. <u>Conaway</u>, 358 S.E.2d at Syl. Pt. 3.

Assuming without deciding that the Estate is a person within a protected class under the WVHRA, the plaintiffs must next show that Scottsdale made an adverse decision against the Estate. Regarding this requirement, the plaintiffs appear to argue that the adverse decision was that the City did not settle or consent to do so, which Scottsdale allegedly aided and abetted in. Therefore, this Court assumes without deciding that the lack of a settlement could be viewed as an "adverse decision" for purposes of WVHRA. Thus, the first two requirements of a WVHRA claim are assumed to be met.

However, as is often the case in WVHRA claims, the "but for" test proves the most challenging. Regarding that requirement, the plaintiffs proffer insufficient evidence to prove that but for the plaintiffs' or the Estate's protected status, Scottsdale would not have made the adverse decision. As stated above, examples of evidence that may satisfy the third requirement include (1) an admission of discriminatory conduct by the defendant, (2) eliminating an apparently legitimate reason for the decision in showing unequal or disparate treatment between protected class members and others, or (3) "using statistics in a large operation" to show that protected class members received "substantially worse"

17

treatment.  <u>Conaway</u>, 358 S.E.2d at 429-30 (footnotes omitted).  The "but for" test in a claim under the WVHRA requires only "that a plaintiff show an inference of discrimination."  <u>Barefoot</u>, 457 S.E.2d at Syl. Pt. 2.  However, the plaintiffs fail to show such an inference.

Regarding the third requirement to prove a prima facie case, the plaintiffs appear to rely on essentially two groups of evidence.  Because of the number of items that must be discussed, each group of evidence is separated below.

a.  <u>Instances of Racism by the City of Huntington</u>

First, the plaintiffs rely on alleged instances of racism by the City and its Police Department.  The plaintiffs assert that the instances of racial animus collectively demonstrate that Scottsdale had a duty to more thoroughly investigate those instances during the settlement and claims process.  Further, the plaintiffs also claim that Scottsdale had a duty to investigate such claims of racial animus in the settlement process pursuant to <u>Michael v. Appalachian Heating, LLC</u>, 701 S.E.2d 116 (W. Va. 2010).  Indeed, the plaintiffs state their position in their response as follows:

> It is Plaintiffs' position rather that the [WVHRA] places a liability on an [sic] "person" commensurate to its response to a complaint or perceived incident of discriminatory conduct, and that what duty Scottsdale did have was at the very least to have investigated the complaint of improper racial motivation in settlement efforts . . . and take some reasonable remedial measure to ensure neither it nor the City was using improper race

18

> motivation in refusing to offer to settle, or refusing to
> give consent to settle the case, and ensure it was not
> assisting the City in its decision not to give consent as
> a result of illegal racial motivation.

ECF No. 182. Regarding the instances that triggered such a duty to investigate, the plaintiffs focus on several. First, the plaintiffs rely on the deposition of Scottsdale employees to attempt to demonstrate that Scottsdale purposefully ignored, or "kept its head in the sand," concerning racial animus in the claim and settlement process. For example, the plaintiffs claim that when Scottsdale's claims analyst was asked if the trial of O. J. Simpson was racially charged, the analyst stated "I don't recall the OJ Simpson [case] having any racial animosity." In another example, the plaintiffs also point to statements where the employees indicated that they were unaware of some alleged instances of racial animus, and that those instances may potentially have been something worth considering in the settlement process. Thus, the plaintiffs argue that an alleged attitude of purposeful ignorance pervaded the settlement process and demonstrated a violation of Scottsdale's duty to investigate issues of racial animus.

Second, the plaintiffs argue that instances of racial animus by the City's Police Department against both the decedent and African-Americans in general put Scottsdale on notice about issues of race. For example, although the grand jury did not indict Officer Lusk, the plaintiffs claim that the City's Police

19

Department displayed racial animus towards the decedent and his family. The plaintiffs point to the deposition of the decedent's mother, wherein she states that she remembers an instance in the mid-1990s when an unidentified police officer used a racial slur against the decedent. ECF No. 182 Ex. B. Another instance that the mother claimed occurred was when the police waited outside her store for the decedent to exit in order to question him regarding potential tax evasion charges. Id. Another example includes instances where the plaintiffs claim that altercations between individuals, some of whom were African-American, and police resulted under the guise of racial discrimination. ECF No. 182 Ex. H. Finally, the plaintiffs claim that the deposition of Mayor Wolfe, the mayor of the City at the time of the underlying action, demonstrates direct evidence of racial animus. If that were the case, that would mean the mayor, who was in charge of withholding or giving consent under the consent to settle clause, theoretically had racial animus. The plaintiffs assert that during his deposition, when asked if Mayor Wolfe had ever used the "N word," the plaintiffs argue the following:

> [Direct evidence of racial animus] is shown clearly here by the Mayor's own response to a question if he had ever used the "N word." "Haven't you?" he asked plaintiff's counsel, as if he expected every Caucasian to have used the term at one time or another.

ECF No. 182. The plaintiffs believe that such allegedly direct evidence satisfies the third requirement under the WVHRA. However,

as will be explained below, no duty is imposed on Scottsdale to investigate whether race played a role in the City's refusal to give its consent to settle. In particular, <u>Michael v. Appalachian Heating, LLC</u> does not create such a duty. Finally, the "direct evidence" that the plaintiffs claim is either insufficient to demonstrate a prima facie case or, as is the case with Mayor Wolfe's deposition, is misquoted and misrepresented.

First, the plaintiffs' interpretation of <u>Michael</u> is misguided. In <u>Michael</u>, the plaintiffs, who were African-American, resided in an apartment located in a public housing development. 701 S.E.2d at 118. The County Housing Authority hired defendant Appalachian Heating, LLC ("Appalachian"), to repair and replace climate control units in the public housing development. <u>Id.</u> Later, the plaintiffs' apartment caught fire, allegedly due to Appalachian's negligence. <u>Id.</u> All of the plaintiffs' belongings were destroyed. <u>Id.</u> Appalachian's insurer, defendant State Auto Insurance Company ("State Auto"), settled the plaintiffs' claims for $2500, and the plaintiffs filed suit under the WVHRA against the defendants. <u>Id.</u> at 119. The plaintiffs alleged that State Auto failed to fairly evaluate the claim and process it because of the plaintiffs' race. <u>Id.</u> State Auto, following an unsuccessful motion to dismiss, orally moved that a question be certified to the West Virginia Supreme Court of Appeals ("the Court"), which was granted. <u>Id.</u> at

120.   The court reformulated the certified question as the following:

> Does the [WVHRA] prohibit discrimination by a tortfeasor's insurer in the settlement of a property damage claim asserted by a member of a protected class under the [WVHRA]?

Id.  In answering the certified question, the court examined the text of West Virginia Code § 5-11-9(7)(A), under which the plaintiffs asserted their claims.  First, the court determined that under that section of the WVHRA, it is an unlawful discriminatory practice for certain entities and groups, including persons, employers, or financial institutions, to do any of the following: "(1) engage in any form of threats or reprisal"; or "(2) engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss"; or "(3) aid, abet, incite, compel or coerce any person to engage in any of the unlawful discriminatory practices" under West Virginia Code § 5-11-9.  Id. at 123.  Further, the Court also found that an insurance company is considered a "person" for purposes of § 5-11-9(7).  Id. at 124.

In answering the certified question in the affirmative, the Court pronounced two holdings.  First, the Court held that § 5-11-9(7)(A) of the WVHRA prohibits unlawful discrimination "by a tortfeasor's insurer in the settlement of a property damage claim when the discrimination is based upon race, religion, color,

22

national origin, ancestry, sex, age, blindness, disability, or familial status." Id. at 124-25. Second, the Court held that a third-party cause of action against an insurer under § 5-11-9(7)(A) is not precluded by the West Virginia Unfair Trade Practices Act ("UTPA"). Id. at 125. Specifically, State Auto argued that the UTPA, under § 33-11-4(a), precluded a third-party action against an insurer. Id. Thus, State Auto asserted that the plaintiffs' only remedy was to file an administrative complaint with the Insurance Commissioner. Id. The Court rejected State Auto's argument, finding that the UTPA and the WVHRA "seek to remedy different harms, and no conflict exists between them." Id.

In this civil action, the plaintiffs claim that Michael imposes a duty on Scottsdale to investigate whether race played a role in the City's refusal to give its consent to settle. This Court disagrees for several reasons. First, as provided above, Michael in no way articulates, holds, or discusses any duty on an insurer to investigate claims of racial motivation in the settlement process. Rather, Michael provides a cause of action under the WVHRA against the unlawful discrimination by a "tortfeasor's insurer in the settlement of a property damage claim when the discrimination is based upon race, religion, color, national origin, ancestry, sex, age, blindness, disability, or familial status." Id. Second, the context of Michael is easily distinguishable from this civil action. Michael pertained to a

property damage claim and an insurance policy that did not contain a consent to settle clause. Further, it involved a situation where liability was clearly determined and not at issue. Instead, the disputed valuation and settlement offer were at issue in Michael. In this civil action, however, liability remained contested in the underlying action until the matter was resolved in favor of the City and Officer Lusk at both the district court and the appellate court levels. Further, no court intervention or litigation occurred prior to the discrimination claim in Michael. In this civil action, the underlying action pertaining to liability remained contested in both the United States District Court for the Southern District of West Virginia and the United States Court of Appeals for the Fourth Circuit. Accordingly, Michael is distinguishable from this civil action. More importantly, it does not create the duty that the plaintiffs claim that Scottsdale breached. At most, Michael simply recognizes the plaintiffs' cause of action.

Notwithstanding the plaintiffs' misplaced reliance on Michael, their proffered evidence, both direct and indirect, of racial animus also fails to demonstrate a prima facie case under the WVHRA. As discussed above, in proving the third requirement under the WVHRA, the plaintiffs must show evidence that would "sufficiently link" the plaintiffs' protected member status and the defendant's decision to infer that the defendant used

discriminatory criteria.  <u>Conaway</u>, 358 S.E.2d at 429-30 (footnotes omitted); <u>Smith</u>, 516 S.E.2d at 279.  After analyzing the evidence presented, the plaintiffs fail to demonstrate a sufficient link between their status as African-Americans and any of Scottsdale's decisions during the settlement process.  First, regarding the depositions of the Scottsdale employees, such as the claims analyst, the statements provided do not demonstrate that but for the decedent's race a settlement would have occurred.  As provided earlier, the insurance policy contained a consent to settle clause that required the insured to give its consent before any settlement occurred.  Scottsdale did not have a duty to investigate whether the City's refusal to consent was based on racially discriminatory reasons, which the plaintiffs allege.  Even if it wanted to, Scottsdale could not unilaterally consent to any settlements.  Further, as this Court understands the plaintiffs' arguments, the plaintiffs also fail to show how any of Scottsdale's employees included the consent to settle clause in the insurance policy in order to aid and abet the City in its alleged acts of unlawful discrimination.  Nonetheless, whether the employees of Scottsdale did or did not know about any incidents of racial animus proves immaterial because Scottsdale did not have a duty to investigate those allegations as to why the City did not settle.  Neither the insurance policy nor the law impose such a requirement or duty upon Scottsdale.

Second, regarding the alleged instances of racial animus, they too fail to satisfy the "but for" test. Notwithstanding the fact that no duty to investigate the refusal to consent existed, the alleged instances of racial animus fail to sufficiently link the plaintiffs' status as African-Americans with that of any allegedly adverse decisions that Scottsdale made. Regarding the proposed settlement, the insurance policy again prevented Scottsdale from unilaterally acting. Further, even if Scottsdale had a duty to investigate instances of racial animus by the City's Police Department, the plaintiffs have not demonstrated that Scottsdale refrained from doing so because the plaintiffs or the decedent are African-Americans. The fact that offensive acts allegedly occur in a community does not automatically demonstrate a prima facie case under the WVHRA. The plaintiffs have a burden of proof that they must satisfy, and here they have not created even an inference that Scottsdale either aided or abetted in, or even directly engaged in, any form of unlawful discrimination based on race. Accordingly, the plaintiffs fail to demonstrate a prima facie case.

It should be noted that the plaintiffs proffer the statements of Mayor Wolfe as direct evidence of racial animus. Again, the plaintiffs provided the following statement in their response:

> [Direct evidence of racial animus] is shown clearly here by the Mayor's own response to a question if he had ever used the "N word." "Haven't you?" he asked plaintiff's counsel, as if he expected every Caucasian to have used the term at one time or another.

ECF No. 182. However, the plaintiffs misquoted the Mayor's statements from his deposition. The exchange actually proceeded as follows:

> Q: Do you think African-American men are more likely to be aggressive with police?
>
> * * *
>
> A: No. No.
> Q: You yourself have not used the N-word?
> A: Possibly in my teenage years in the 1950's, but not the last 50 years, no.
> Q: Certainly not since you've been in public office?
> A: Have you ever?
> Q: No. And I'll let you ask that one question of me. No.

ECF No. 173 Ex. S. Further, when asked whether "it would be appropriate to use" the consent clause "as a shield to keep the City or [Scottsdale] from fairly evaluating the claim," Mayor Wolfe directly responded with "No." Id. Not only did the plaintiffs misquote the Mayor's statements from the deposition, but the statements made also provide no direct evidence of a sufficient link between the plaintiffs' protected status and any decisions by Scottsdale or the City.

b. Expert Testimony of Dr. Berard

Second, the plaintiffs rely on the testimony of their expert witness, Dr. Berard. He has a Ph.D. in Sociology from Boston University. Dr. Berard concluded that "[i]f the City did harbor racial prejudice or stereotyping towards the Porter family, to a reasonable degree of sociological probability, this would likely

27

have affected the decision of the City to give consent to settle."

ECF No. 173 Ex. P.  Further, Dr. Berard also concluded that

> [i]f the insurance company had a duty not to aid and abet
> another person (the City) in unlawful discriminatory
> conduct, which I cannot say because I am not a legal
> expert, then deferring to the City's refusal to settle
> would involve the insurance company in aiding or abetting
> conduct which kept the Porter family from getting a
> reasonable offer of settlement after Plaintiffs had
> raised concerns about racial prejudice and
> discrimination.

Id.  The plaintiffs also provide that Dr. Berard allegedly
determined that "12 of 14 Scottsdale cases, where no offer was
made, despite involving a death case, involved racial or ethnic
decedents."  Id.  Scottsdale, in its reply memorandum, indicates
that Dr. Berard's "analysis" is inaccurate and manipulated.
Specifically, Scottsdale points out that Dr. Berard actually
received 27 cases to evaluate, but that 13 of those did not
identify the race of the decedents.  Further, Scottsdale also notes
that none of the cases analyzed by Dr. Berard involved situations
where consent to settle clauses existed.  Finally, Scottsdale also
indicates that the cases Dr. Berard analyzed did not provide
information regarding the assessment of liability.

Dr. Berard's conclusions, however, are insufficient in
demonstrating that the plaintiffs' protected status and any adverse
decisions were sufficiently linked as required under the WVHRA.
First, in his deposition regarding the first above quoted
statement, Dr. Berard agreed that his conclusion was conditioned

28

upon the City actually harboring racial prejudice.  <u>Id.</u>  Dr. Berard

then admitted that "I don't know for a fact that the City did

harbor racial prejudice . . . **<u>I don't know that it was a factor at</u>**

**<u>all</u>**."  <u>Id.</u> (emphasis added).  Dr. Berard also stated that "I'm not

aware, in my capacity as an expert, that any decision made by

Scottsdale was due to race."  <u>Id.</u>  Second, and more damaging than

his prior statements, is that Dr. Berard's opinions were made

concerning the conduct or decision-making of the City and

Scottsdale in the insurance handling context, despite his lack of

expertise in insurance claims or settlements.  When asked about his

expertise, the following dialogue occurred between Dr. Berard and

Scottsdale's counsel:

> Q:   Which, if any, of the peer-reviewed journal articles
> listed in your CV . . . would relate to the issue of
> evaluating a settlement decision or non-settlement
> decision in a situation with a consent to settle
> requirement?
> A:   None of my published work has looked at the
> insurance industry or legal settlement procedures.

* * *

[Regarding whether Dr. Berard had any training  or experience in

insurance work or case claims]

> Q:   What about review and application of insurance
> policies and provisions?
> A:   No.
> Q:   What about insurance claims handling?
> A:   No.
> Q:   What about insurance claims settlement?
> A:   No.
> Q:   What about civil litigation claims settlement?
> A:   No.

Id. As his own admissions show, his testimony does not demonstrate an inference that Scottsdale engaged in any form of racial discrimination by Scottsdale. Dr. Berard's opinions are conditioned on whether Scottsdale or the City harbored racial animus without demonstrating that it was indeed the case. Dr. Berard readily admitted that he does not know if race was even a factor in the settlement and claims process. Not only is his status as an expert in this case questionable, but also his conclusions are based on assumptions of unverified facts that are necessary to prove a prima facie case.

Further, his opinion fails to demonstrate any genuine issues of material fact. Regarding issues of material fact, a nonmoving party "cannot create a genuine issue of material fact" by "mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). "Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Anderson, 477 U.S. at 251 (internal citations omitted)). Further, expert testimony itself does not automatically create issues of material fact. See Estate of Shaw v. Sierra, 366 F. App'x 522 (5th Cir. 2010); Advanced Technology Materials, Inc. v. Praxair, Inc., 228 F. App'x 983 (Fed. Cir. 2007); Celestine v. Petroleos de

Venezuella SA, 266 F.3d 343, 357 (5th Cir. 2001); Kusmirek v. MGM
Grand Hotel, Inc. 7 F. App'x 734 (9th Cir. 2001); Bieghler v.
Kleppe, 633 F.2d 531, 534 (9th Cir. 1980); Robinson v. Resorts
Intern., Inc., 95-CV-0052, 1997 WL 803758 (E.D.N.Y. Dec. 4, 1997).

After examining his statements in the deposition and his
conclusions, Dr. Berard's conclusions fail to "sufficiently link"
the plaintiffs' protected member status and Scottsdale's decision
to infer that Scottsdale used discriminatory criteria. See
Conaway, 358 S.E.2d at 429-430 (footnotes omitted); Smith, 516
S.E.2d at 279. The conclusions that he provides are not only based
on conditions and assumptions, but also on facts whose existence he
admits he cannot verify. As he admitted before, he did not know if
the City or Scottsdale harbored any racial animus or if such
discriminatory criteria served as a factor in deciding whether to
settle. In this case, these conclusions fail to create genuine
issues of material fact. See generally Major League Baseball
Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2nd Cir.
2008) ("A party opposing summary judgment does not show the
existence of a genuine issue of fact to be tried merely by making
assertions that are conclusory . . . or based on speculation.");
Evers v. General Motors Corp., 770 F.2d 984, 987 (11th Cir. 1985)
("This court has consistently held that conclusory allegations
without specific supporting facts have no probative value.").
Thus, the plaintiffs' expert testimony fails to demonstrate either

a prima facie case under the WVHRA or a genuine issue of material fact.

2.  Establishing Pretext

Notwithstanding that the plaintiffs fail to show that a prima facie case exists, even if they had, Scottsdale proffers legitimate, nondiscriminatory reasons for its decisions.  As stated earlier, if the plaintiffs satisfy their burden of proving a prima facie case, then the defendant must offer a legitimate, nondiscriminatory reason for the decision.  Barefoot, 457 S.E.2d 152, 160.  After the defendant presents its reasons, the plaintiffs may then demonstrate that either (1) the defendant treated discriminatory criteria as a determinative factor in its decision, or (2) the defendant's rationale serves as merely a pretext for discrimination.  Id.  To show pretext, a plaintiff must show direct or circumstantial evidence of falsity or discrimination.  Id.  "The plaintiff's failure to come forth with evidence rebutting the defendant's explanation may entitle the defendant to judgment." Id.

In arguing that a legitimate reason existed as to why the claim did not settle in the underlying action, Scottsdale first argues that the consent to settle clause required the consent of the City.  Therefore, without such consent, Scottsdale could not settle any claims pursuant to the insurance policy's terms. Second, Scottsdale asserts that race did not affect either its

assessment of the claim or the City's refusal to consent to settle. Scottsdale points to statements from its claims analyst, Gwen Aliotta ("Aliotta"), and her supervisor, Bonnie Windsor ("Windsor"). Scottsdale claims that in their depositions, both Aliotta and Windsor indicate that the case was not viewed as a racial one and that the City refused to settle because it honestly believed it was not liable. Further, Scottsdale also points to the depositions of Mayor Wolfe and then-Chief of Police Skip Holbrook, wherein they also indicated that race was not a reason for withholding the City's consent to settle. For those reasons, Scottsdale argues that legitimate, non-discriminatory reasons existed as to why the City did not consent to any proposed settlement.

Looking at Scottsdale's reasons and accompanying evidence, Scottsdale has demonstrated that legitimate reasons exist as to why no settlement occurred. In Aliotta's deposition, when asked repeatedly if the case was racially charged or contained racial overtones, she consistently answered "No." ECF No. 173 Ex. Q. Further, regarding the decision not to consent to the proposed settlement, Aliotta provided that she did not develop a negotiation plan for a settlement because defense counsel for the insured at that time indicated (1) that the insured would withhold consent, and (2) that the City and Officer Lusk were not liable. Id. In addition to Aliotta, Windsor also indicated that Scottsdale agreed

with the insured's two main reasons for withholding consent: (1) that the City should protect their officer, Officer Lusk, and (2) that a very small percentage of a chance of liability existed. ECF No. 173 Ex. R. Further, when asked about whether the underlying case would succeed at trial was "the fact that it would be an all-white jury in Huntington, West Virginia hearing [the] case," Windsor responded, "Absolutely not. I don't recall any discussions like that."

Finally, in Mayor Wolfe's deposition, he indicates that one factor behind refusing to consent to settle resulted from then-Chief of Police Skip Holbrook opining that the City had a strong defense against any claims of excessive force. ECF No. 173 Ex S. From the depositions before this Court, it is clear that the City withheld consent to settle because it viewed the chances of liability existing as minimal and that the City should protect Officer Lusk from any insufficient claims. Further, Scottsdale demonstrates that the City withheld its consent to settle pursuant to the consent to settle clause. Analyzing the statements above, Scottsdale has satisfied its burden of demonstrating legitimate reasons behind the decision not to settle.

However, pursuant to West Virginia law, the plaintiffs have an opportunity to demonstrate that those legitimate reasons served as mere pretexts for discrimination based upon race. Barefoot, 457 S.E.2d at 160. To show pretext, a plaintiff must show direct or

circumstantial evidence of falsity or discrimination. <u>Id.</u> "The plaintiff's failure to come forth with evidence rebutting the defendant's explanation may entitle the defendant to judgment." <u>Id.</u> Here, the plaintiffs fail to come forth with rebutting evidence, and therefore Scottsdale is entitled to summary judgment. Regarding pretext, the plaintiffs again point to Dr. Berard's conclusions and speculation. Further, they again assert that Scottsdale had a duty to investigate claims of racial animus. They also attempt to argue that the consent to settle clause acted as "a ruse in discriminating against the Estate on the basis of race." ECF No. 182. Finally, they point to alleged deviations in the insurance handling process that again demonstrate the existence of pretext.

Those arguments all fail to demonstrate pretext. As discussed above, Dr. Berard stated in his deposition that "I don't know for a fact that the City did harbor racial prejudice . . . I don't know that it was a factor at all." ECF No. 173 Ex. P. Dr. Berard also stated that "I'm not aware, in my capacity as an expert, that any decision made by Scottsdale was due to race." <u>Id.</u> After analyzing the remaining aspects of Dr. Berard's deposition and conclusions, they fail to qualify as sufficient direct or circumstantial evidence of falsity or discrimination so as to show pretext. Regarding the alleged duty of Scottsdale that the plaintiffs claim exists under <u>Michael v. Appalachian Heating, LLC</u>

to investigate the reasons why an insured refused to consent to settle, no such duty exists in that case. In addition, the plaintiffs' arguments regarding the consent to settle clause are conclusory at best. They articulate no discriminatory reason for including the clause within the insurance policy, which was issued before the incident occurred. Further, they provide no proof, either direct or indirect, of how the consent to settle clause was used as a pretext for discrimination. As discussed above, concerning the City and Scottsdale, none of the individuals involved in the settlement or claim process displayed even a hint of discriminatory behavior or that racially discriminatory criteria factored into their decision-making process.

Finally, regarding deviations in policy, the plaintiffs claim that incidents such as Scottsdale's lack of a negotiation plan demonstrated a deviation from Scottsdale's policies. In the deposition of Aliotta, the plaintiffs point to the fact that a formal action plan was not drafted and that Scottsdale itself did not respond to the plaintiffs' counsel's letters regarding settlement, though Scottsdale allegedly had a duty to do so. However, Aliotta responded that while Scottsdale, if it had the authority, would normally respond to settlement letters, the insurance policy here contained a consent to settle clause. Further, as Aliotta stated in her deposition, the City refused to settle and thus, Scottsdale did not respond to any offers of

settlement.  ECF No. 182 Ex B-1.  As another example, the plaintiffs point to the fact that Aliotta may not have "properly" taken notes on the situation.  Despite those "deviations," the plaintiffs provide no indications that Scottsdale or the City did not respond to the settlement offers because of racial animus or other discriminatory reasons.  Even if an alleged deviation in proper responses to correspondence occurred, or that Aliotta did not properly take notes, no direct or indirect proof has been presented to show that this either resulted in a bad faith settlement process, or, more importantly, that it was done as an excuse for racially discriminatory conduct.  Thus, the plaintiffs fail to rebut Scottsdale's legitimate reasons for it and the City's actions.

It should be noted that the plaintiffs argue that <u>Carlile v. Farmer's Insurance Exchange</u>, 173 Cal.App.3d 975 (Cal. App. 1985), which Scottsdale originally relied on, applies in their favor regarding pretext.  Specifically, they appear to claim that <u>Carlile</u> shows what an insurer who actually investigated the claim in good faith did, and why in that case, unlike here, summary judgment was granted.  However, this Court finds that again the plaintiffs' argument is misplaced and also fails to see how it demonstrates any pretext.  Based on the record before this Court, Scottsdale conducted a good faith investigation.  Indeed, Aliotta stated in her deposition that she, and in discussions with her manager,

Windsor, "[r]eviewed the information that was coming in, all aspects of it, and our investigation, and whether or not we thought there was liability. We took everything into consideration." ECF No. 182 Ex. B-1. The plaintiffs provide no evidence that Scottsdale handled the claim process in bad faith or with any form of racial animus. As the Court provided in <u>Carlile</u>, which involved an insurance company that did not consent to settlement pursuant to a consent to settle clause, "To accept plaintiff's position would compel insurers to take every step within their power to settle before they are deemed to have acted in good faith." 173 Cal.App.3d at 982. Thus, again, the plaintiffs fail to demonstrate pretext in the settlement and claims process.

Accordingly, for the reasons stated above, the plaintiffs failed to demonstrate a prima facie case of a violation under the WVHRA. Further, even if a prima facie case existed, Scottsdale proffered legitimate, non-discriminatory reasons why no settlement occurred. The plaintiffs failed to rebut it by showing Scottsdale's reasons were a pretext for unlawful discrimination. Finally, based on the evidence before this Court, no genuine issues of material fact exist. Therefore, Scottsdale's motion for summary judgment is granted.

### 3. Beneficiaries

Scottsdale next argues that the individual beneficiaries to the plaintiffs are not entitled to recover from Scottsdale.

However, because Scottsdale's motion for summary judgment is granted, this Court will not address Scottsdale's argument concerning the ability of individual beneficiaries to recover in this civil action because it is now moot.

4. <u>Punitive Damages</u>

Finally, Scottsdale argues that the plaintiffs are not entitled to punitive damages. Similar to Scottsdale's argument concerning the recovery by individual beneficiaries, this argument is now moot because Scottsdale's motion for summary judgment is granted. Accordingly, this Court will not address Scottsdale's arguments against punitive damages.

B. <u>Plaintiffs' Motion To Seal</u>

As stated earlier, the plaintiffs filed a second motion to seal on November 5, 2014. ECF No. 192. Prior to that second motion to seal, the plaintiffs already filed a motion to seal, which pertained to sensitive information in their response to Scottsdale's motion for summary judgment. ECF No. 184. Out of an abundance of caution, this Court provisionally granted that motion because the plaintiffs in their prior motion to seal did not specifically identify what materials needed to be sealed. ECF No. 185. In their second motion to seal, which is at issue here, they identified those specific materials and again request this Court to seal the materials. Scottsdale did not respond. After examining each of the identified items, this Court concludes that those

materials do contain sensitive information, such as social security numbers. Regarding this Court's order provisionally granting the motion to seal, no reason exists to change that ruling. Accordingly, the plaintiffs' motion to seal (ECF No. 192) is hereby granted.

C. Remaining Motions

Following Scottsdale's motion for summary judgment, the parties have each filed several motions in limine. ECF Nos. 181, 188, 196, 197, 198, 199, 200, 201, 202, 203, 204, and 205. Because this Court grants Scottsdale's motion for summary judgment, the motions in limine are moot at this stage. Accordingly, the pending motions in limine are denied as moot.

## V. Conclusion

For the reasons set forth above, Scottsdale's motion for summary judgment is GRANTED. Accordingly, the pending motions in limine are hereby DENIED AS MOOT. Further, the plaintiffs' motion to seal is GRANTED. The scheduled pretrial conference and trial are VACATED. It is further ORDERED that this civil action be DISMISSED and STRICKEN from the active docket of this Court.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein. Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:     December 16, 2014

/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE